**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Knut STEINFELS, Defendant-Appellant.**

**No. 84–2310.**

United States Court of Appeals, Fifth Circuit.

Feb. 1, 1985.

Rehearing and Rehearing En Banc Denied March 8, 1985.

---

Marvin Johnson, Charles Hultstrand, Phoenix, Ariz., for defendant-appellant.

Daniel K. Hedges, U.S. Atty., James R. Gough, Patrick H. Molloy, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

Before GOLDBERG, RUBIN and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Knut Steinfels[1] was convicted by a jury of having introduced two imported automobiles into United States commerce by means of false statements in violation of 18 U.S.C. § 542.[2] Steinfels appeals his conviction, attacking the sufficiency of the evidence. Steinfels' convictions are affirmed.

## Background

In January 1983, Karl Heinz Schruder, on behalf of V.I.P. Auto Sales, Inc.,[3] in Scottsdale, Arizona, contacted Knut Steinfels of Im-& Export Co., in Hamburg, West Germany, to arrange the purchase of two Mercedes-Benz automobiles from Germany for resale in the United States. Schruder arranged for a letter of credit in the amount of $36,618 for the purchase of the cars in West Germany.[4] Schruder also made arrangements with Daniel Fagerstrom of International Customs Service, Inc. (ICS), a licensed customshouse broker and international freight forwarding service, for assistance in processing the cars

---

1. Karl Heinz Schruder, a/k/a Heinz K. Schweizer, was also charged along with Steinfels in a three-count federal grand jury indictment. Count One charged conspiracy to introduce imported automobiles into United States commerce by means of false statements in violation of 18 U.S.C. §§ 542 & 371. Counts Two and Three charged substantive violations of 18 U.S.C. §§ 542 & 2. Prior to Steinfels' trial, Schruder entered into a plea agreement with the Government whereby he entered a plea of guilty to the conspiracy charge in exchange for the dismissal of the other counts against him. A jury acquitted Steinfels of the conspiracy charge, but convicted him of the substantive offenses. The district court thereafter sentenced Steinfels to two concurrent two-year terms of imprisonment and a $2,500 fine on each count. The prison terms were suspended, however, and Steinfels was placed on two years' supervised probation.

2. 18 U.S.C. § 542 provides in pertinent part:

    Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance, or makes any false statement in any declaration without reason-

    able cause to believe the truth of such statement, or procures the making of any such false statement as to any matter material thereto without reasonable cause to believe the truth of such statement, whether or not the United States shall or may be deprived of any lawful duties....

    . . . .

    Shall be fined for each offense not more than $5,000 or imprisoned not more than two years, or both.

3. V.I.P. Auto Sales is owned and operated by Virgil Doerfler and his son Mark. Schruder approached the Doerflers at their place of business and represented to them that he was experienced in the importation of foreign automobiles and that he was able to locate and arrange for the shipment of German automobiles to the United States at a good price. The original agreement between Schruder and V.I.P. involved the procurement of a Mercedes-Benz 500SL for Virgil Doerfler's use as his personal car. The Doerflers later decided to instead purchase two model 190SL Mercedes-Benz automobiles for commercial resale. Record Vol. V at 3–15; 116–18.

4. Virgil Doerfler guaranteed the letter of credit with his personal signature through First Interstate Bank in Phoenix, Arizona. Record Vol. V at 11.

through United States Customs upon their arrival in Houston, Texas.

The cars, one champagne-colored and the other silver, arrived at Houston Intercontinental Airport on February 18, 1983, aboard a KLM Airlines cargo flight from Hamburg, and were unloaded and stored in the KLM warehouse. On that same date, in accordance with routine United States Customs procedures, Senior United States Customs Inspector Findley Soule examined the automobiles at the KLM warehouse for import compliance, and noted that neither vehicle complied with United States Environmental Protection Agency (EPA) and Department of Transportation (DOT) standards.[5] Inspector Soule also inspected the documents that accompanied the cars and noted that "the shipper was a Mr. Steinfels in Germany, that the cars were shipped to a Mr. Heinz Schweizer [Schruder], care of VIP Auto Sales in Scottsdale, Arizona, and that the shipment ... look[ed] like a commercial shipment." Record Vol. IV at 162.

On February 23, Steinfels and Schruder arrived at ICS to take delivery of the cars. Steinfels executed a Declaration for Free Entry of Unaccompanied Articles (Customs Form 3299) on each car in which he declared that the cars would be used by his brother[6] and himself for their personal transport while in the United States and that the cars would be returned to Germany within nine months. Steinfels also signed EPA Form 3520-1 and DOT HS Form 7 on each car declaring that the cars were for personal use and would not be sold in the United States.[7] These documents, along with xerox copies of Steinfels' and his brother's passports, were then submitted to United States Customs at Houston Intercontinental Airport by ICS's airport runner in order to effect the release of the cars from the control of Customs.

Because Inspector Soule's initial inspection of the automobiles and their accompanying documents indicated to him that the shipment was a commercial one, he was suspicious of the personal entry documents and refused to release the cars from Customs. Soule then requested that ICS furnish him with additional documentation stating the purpose of the importation, and specifically, the length of time that the vehicles would be in the United States.

**5.** At trial, Inspector Soule described his duties as follows:

> My responsibility at the Intercontinental Airport is to examine automobiles that come into the United States, to detect whether or not these automobiles comply with U.S. Import Regulations, whether or not these automobiles need to have certain modification work done to them, and to examine the entries that are produced by the brokers for the automobiles to ascertain that they have been properly entered, and properly classify, that the import taxes have been paid, and all related agency regulations have been met.
> 
> ....
> 
> Either I or one of the members of my staff will go over to the automobile at the airline that it's located at, we will examine the automobile for the compliance standards, we will look at the documentation that arrives with the automobile to try to ascertain whether or not there is any type of fraudulent entry that will be presented for the automobile, we will ascertain whether or not there's going to be further processing that's going to be necessary at the time entry is made for the automobile.

Record Vol. IV at 155–56. In examining the two Mercedes-Benz automobiles involved in this

case, Soule found that the headlights, taillights, bumpers, doors, and speedometer were not in compliance with DOT standards. As for EPA standards, there were no smog control devices, nor were there catalytic converters; and the cars had not been converted to operate on unleaded fuel. *Id.* at 161.

**6.** From the record, it appears that Steinfels' brother, Marc, neither accompanied Knut to the United States, nor did he participate in the importation scheme. Steinfels testified that Schruder had asked him to bring Marc's passport so that the cars could be entered "informally" under the names of two individuals rather than formally under the name of V.I.P. Record Vol. VI at 90–91.

**7.** Under United States Customs regulations, a foreign national may bring his car into the United States without paying Customs duty if he declares that the vehicle will only be used for transport of himself (or his family) and that the car will be exported within one year. Further, under this personal use entry, the non-resident is exempted from having to comply with EPA and DOT regulations if he declares that the cars will not be sold in the United States. *See* 19 C.F.R. § 148.45 (1984).

In response to the inquiry by Customs, Schruder, purporting to be the president of V.I.P., executed a letter in which he disavowed any interest in the cars. At the same time, Steinfels signed an affidavit in which he declared that "[t]he purpose of my trip is personal education and tourism (sightseeing)" and that "[a]t the end of my trip, I plan to export the automobiles from Houston directly to West Germany...."[8] Government's Exh. 11. Fagerstrom then drove Steinfels and Schruder to the airport where they submitted the additional letter and affidavit, along with the Customs entry documents, EPA and DOT forms, and Steinfels' and his brother's passports, which they had originally submitted. Based on the above documentation, United States Customs released the two Mercedes-Benz automobiles from its control.[9] After securing possession of the cars from the KLM warehouse, Schruder and Steinfels drove them to the ICS warehouse, where Fagerstrom kept the silver car as security for unpaid air freight charges. Steinfels and Schruder then drove the champagne-colored Mercedes to Arizona.

On February 25, a United States Customs agent, posing as a potential buyer, called the V.I.P. offices and spoke with a V.I.P. salesman. The salesman informed the agent that V.I.P. had two Mercedes-Benz cars for sale, one champagne in color, and the other silver. Later that evening, Customs agents observed the champagne-colored Mercedes on the V.I.P. sales floor.

Thereafter, the car was observed being driven away with V.I.P. license plates on it.

On March 1, Schruder phoned Fagerstrom at ICS and informed him that Mark Doerfler of V.I.P. would arrive in Houston on March 3 to pick up the silver Mercedes. Doerfler thereafter took possession of the car and drove it to Phoenix. Schruder then arranged to have German Auto Service of Phoenix install antipollution devices and air conditioners in the two cars. On March 9, United States Customs agents seized both cars at German Auto Service. The indictments against Steinfels and Schruder followed.[10]

At trial, the Government proceeded on the theory that Steinfels and Schruder schemed together to bring the cars into the United States in avoidance of United States Customs duty by declaring them exempt, when in fact they intended to put the cars into commerce and to offer them for sale. Steinfels predicated his defense upon his alleged ignorance of United States Customs laws and his reliance upon Schruder's assurances that the "informal" procedures they followed were perfectly acceptable.

On appeal, Steinfels contends that the evidence was insufficient to sustain his conviction.[11]

## Discussion

### I. Standard of Review

In examining Steinfels' attack on the sufficiency of the evidence, this Court must

---

8. Due to Steinfels' difficulty with writing in English, Fagerstrom actually wrote out the affidavit in longhand. After Fagerstrom wrote out the affidavit, he reviewed its contents with Steinfels. Steinfels then signed the document before a notary. Record Vol. III at 99.

9. The physical release of the vehicles occurred when a United States Customs inspector signed the two Customs 3299 Forms and a tally, a document which indicates to an airline that a vehicle has been released by Customs. Record Vol. IV at 199.

10. See note 1 *supra.*

11. Following his conviction, Steinfels filed a motion for judgment of acquittal and/or for new trial in which he alleged that: (1) the statements that he made were not, as a matter of law, the means by which the goods were

entered or introduced into commerce; (2) the statements were not material; (3) the evidence was insufficient to support the jury verdict; (4) the district court improperly permitted hearsay testimony at the "James Hearing" in determining whether a conspiracy existed; (5) the district court erred in refusing to give certain of Steinfels' requested jury instructions; and (6) the court erred in admitting hearsay evidence of a co-conspirator's statements at trial. The only issue briefed and argued by Steinfels on appeal, however, is his attack on the sufficiency of the evidence, which we view as encompassing claims (1)–(3). The other issues, not being briefed on appeal, are deemed by the Court to be abandoned. *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 488 n. 7 (5th Cir.1984).

decide whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). In so doing, we must view the evidence and the inferences that may be drawn from it in the light most favorable to the jury verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

## II. 18 U.S.C. § 542

This Circuit has set forth four essential elements that the Government must prove in order to secure a conviction under section 542: (1) the defendant made a false statement, (2) which was material and which (3) he knew to be false, by which (4) he introduced or attempted to introduce imported goods into United States commerce. *United States v. Ven-Fuel, Inc.*, 602 F.2d 747, 752–53 (5th Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980); *accord United States v. Ackerman*, 704 F.2d 1344, 1347 (5th Cir.1983). Steinfels contends that the Government failed to prove that he violated section 542 as a matter of law because the false statements were made after the cars had already been introduced into United States commerce.

In sole reliance upon *United States v. Twenty-Five Packages of Panama Hats*, 231 U.S. 358, 34 S.Ct. 63, 58 L.Ed. 267 (1913), Steinfels argues that the cars were introduced into commerce within the meaning of the statute at the moment that they were unloaded from the plane in Houston and became subject to the control of United States Customs. In *Panama Hats*, the Supreme Court had occasion to construe the meaning of "introduce or attempt to introduce into commerce" within the intendment of the predecessor statute to the present section 542. There, the Government brought forfeiture proceedings against the defendant hats for fraud by foreign consignors. The hats had been fraudulently undervalued by consignors in

a foreign country and were consigned to a merchant in New York. Although the goods had not technically entered at the New York customshouse, they had been unloaded from a ship and stored in general order. When the hats had not been claimed by the consignee within one year, the Government instituted forfeiture proceedings against the merchandise. In rejecting the claimant's argument that there had been no entry of the goods, the Court stated:

> [W]hen the goods, fraudulently undervalued and consigned to a person in New York, arrived at the port of entry, there was an attempt to introduce them into the commerce of the United States. When they were unloaded and placed in general order, they were actually introduced into that commerce, within the meaning of the statute intended to prevent frauds on the customs.

231 U.S. at 362, 34 S.Ct. at 65. Thus, in reliance upon the above quoted language, Steinfels maintains that his subsequent false statements in the Customs, DOT, and EPA documents did not cause the automobiles to enter the commerce of the United States because the vehicles had already been introduced into commerce. We reject Steinfels' overly restrictive construction of the *Panama Hats* language.

In essence, Steinfels urges this Court to construe *Panama Hats* and section 542 as defining introduction into commerce as occurring at one instant in time. This we cannot do. Under our reading of *Panama Hats*, introduction into commerce commences upon the arrival of imported goods upon United States soil, but introduction does not necessarily end there. Indeed, nothing in the Supreme Court's language in *Panama Hats* suggests that acts following the moment at which imported goods come under the control of United States Customs cannot be the means by which the goods are introduced into commerce. Furthermore, Steinfels concedes that the automobiles would not have been released from Customs if the later documents had not been executed. We thus find it nonsensical to suggest that the cars were subject to the

statute upon their removal from the transporting aircraft and subsequent storage in the KLM warehouse, but that they were no longer subject to the statute after that time.

The evidence, as discussed hereinabove, established that based on the documents executed by Steinfels, United States Customs cleared the two Mercedes-Benz automobiles for entry into the United States for Steinfels' personal use upon his declarations that the cars would be exported in less than one year, and that they would not be offered for sale in the United States. These false statements thus effected the duty-free entry of the cars and their exemption from United States environmental and safety requirements. This evidence was more than sufficient to enable a reasonable trier of fact to find beyond a reasonable doubt that Steinfels was guilty of introducing imported automobiles into United States commerce by means of false statements.

Accordingly, Steinfels' convictions for violating 18 U.S.C. § 542 are

AFFIRMED.